IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

LISA KIMES                        :
                                  :
              Plaintiff           :
         v.                       :      CIVIL NO.   3:14-CV-00091
                                  :
UNIVERSITY OF SCRANTON            :            (Judge Brann)
                                  :
              Defendant           :

## MEMORANDUM
August 25, 2015

Currently pending before this Court is Defendant University of Scranton's

(the "University") Motion for Summary Judgment (ECF No. 44) and

accompanying statements of facts and legal briefs, (ECF Nos. 45, 46, 54, 55), as

well as Plaintiff Lisa Kimes' brief in opposition and reply statement of facts.  (ECF

Nos. 52, 53).  The matter has been fully briefed and is now ripe for disposition.

For the following reasons, the Motion for Summary Judgment is granted in part

and denied in part.

## I. BACKGROUND[1]

On May 12, 2008, Ms. Kimes was hired by the University's Department of

Public Safety (the "Department") as a Public Safety Officer.  (ECF No. 46, Ex. B).

Throughout most of her time with the Department, Ms. Kimes' supervisors

---

[1] The following background is culled from undisputed facts.  See (ECF Nos. 100, 109).  Where
conflicts in facts exist, those facts are presented in the light most favorable to Ms. Kimes.

consisted of Chief of Police Donald Bergmann, Captain Thomas Cadugan, Sergeant Thomas Savero, and Sergeant Kipp Adcock. See (ECF No. 52, Ex. LL-OO). Ms. Kimes was the only female officer on her shifts. Id. at Ex. KK, 443:22-25; 444:1-6.

On November 11, 2008, Ms. Kimes received her first performance evaluation; her performance at the time was rated as "meets or exceeds expectations"[2] without any negative comments. (ECF No. 46, Ex. C). On June 9, 2009, Ms. Kimes received a second mostly positive performance evaluation, again noting that her performance "meets or exceeds expectations." Id. at Ex. D.

On October 24, 2009, Ms. Kimes completed Act 120 Municipal Police Officers' Education and Training after graduating from the Lackawanna College Police Academy and received a pay raise accordingly. Id. at Ex. E. On February 13, 2010, Ms. Kimes became a sworn police officer with the Department and received another pay raise. Id. at Ex. F.

**A. Disciplinary History and FMLA Leave**

In 2009, Ms. Kimes was reprimanded by Sergeant Savero for allegedly leaving her assigned patrol zone without any coverage while she used the gym facilities. (ECF No. 53, Ex. M). Ms. Kimes disputed this accusation, and felt her actions were "being scrutinized." Id. Consequently, she filed a complaint with

---

[2] Captain Cadugan and Sergeant Savero were responsible for issuing Ms. Kimes performance evaluations. (ECF No. 53, Ex. MM, 11:22-24, OO, 14:15-20).

Captain Cadugan to address this allegedly disparate treatment.  Id.  Captain Cadugan did not investigate or take any action in response.  Id. at Ex. A.

Beginning on August 4, 2010 and continuing through 2012, Ms. Kimes was issued a series of reprimands relating to various alleged infractions, including tardiness, failure to follow proper procedures, and failure to follow orders.  On that date, Ms. Kimes received a verbal reprimand regarding her untimely vacation requests, tardiness, and excessive break times.  (ECF No. 46, Ex. G).  On November 17, 2010, Ms. Kimes received a verbal reprimand for tardiness, wherein Sergeant Savero noted that it was "not the first instance where" he spoke with Ms. Kimes regarding her tardiness.  Id. at Ex. H.

On February 22, 2011, Ms. Kimes was issued a reprimand for releasing a "mildly intoxicated" student, despite University policies that allowed officers to do so.  (ECF No. 53, Ex. O).  On May 17, 2011, Ms. Kimes was given two purses by library staff to place in lost and found.  (ECF No. 46, Ex. I).  Rather than place the purses in lost and found, Ms. Kimes placed the purses in her personal vehicle; for this, she was issued a written corrective notice.  Id.

On June 10, 2011, Ms. Kimes was issued a written corrective notice for failing to attend a Student Affairs retreat.  Id. at Ex. H.  Ms. Kimes disputes the charge, and contends that her schedule was changed, causing her to be unable to attend.  (ECF No. 53, Ex. G, 141:8-15).  She alleged that Sergeant Savero

fabricated the incident.  Id.  On July 2, 2011, she received a verbal reprimand for failing to patrol her assigned route.  (ECF No. 46, Ex. K).  On August 22, 2011, she was reprimanded for patrolling with another officer in the car.  Id. at Ex. H.

On December 27, 2011, Ms. Kimes was reprimanded for repeatedly contacting her husband for advice on how to perform her job, rather than contacting a supervisor.  Id.  On January 28, 2012, Ms. Kimes was reprimanded for driving her patrol vehicle into a prohibited area and coming into contact with protestors after being instructed to avoid the area.  Id.  On July 10, 2012, Ms. Kimes was given a written corrective notice for failing to follow an order from Captain Cadugan to take down community advisories.  Id. at Ex. L.

On December 9, 2011, Ms. Kimes submitted a request for intermittent Family Medical Leave Act ("FMLA") leave to care for her son, who was suffering from diabetes.  (ECF No. 46, Ex. M).  Ms. Kimes did not require any time off at the time of the request.  Id.  Ms. Kimes alleges that the University never discussed the request with her, nor did it ever notify her that the request had been approved. (ECF No. 53, Ex. A, ¶ 4).

On July 1, 2012, Ms. Kimes requested time off under the FMLA to care for her son.  (ECF No. 46, Ex. H).  Captain Cadugan later noticed that Ms. Kimes had been tagged in a Facebook photo at a bar at 1 a.m. on July 1, 2012, approximately four and one-half hours prior to requesting the time off.  Id. at Ex. J, 336:18-337:9.

Due to this revelation, Captain Cadugan interviewed Ms. Kimes to verify her request for FMLA leave.[3] Id. at Ex. N, 59:9-60:24. During a meeting in July 2012, Captain Cadugan stated that Ms. Kimes appeared "inconsiderate" for calling in under her FMLA leave because the Department was short staffed at the time and other officers needed to cover her shift. Id. at Ex. U. Ms. Kimes complained of this incident to Chief Bergmann because she believed it was a violation of the FMLA; Chief Bergmann reiterated that the request was inconsiderate.[4] Id.

**B. Disparate Treatment**

In the summer of 2012, Ms. Kimes was ordered to clean the Department's break room despite the fact that no other officer had ever been ordered to clean the break room because the Department had a cleaning staff. (ECF No. 53, Ex. G. 35:20-37:18). Sergeant Savero admitted in his deposition that officers are never assigned to clean the break room. Id. at Ex. OO, 29:1-7.

During her tenure with the University, Ms. Kimes was also subjected to several misogynistic comments. During her 2012 yearly review, Sergeant Savero informed Ms. Kimes that "he doesn't feel comfortable with female officers" and no longer wanted Ms. Kimes on his shift. (ECF No. 52, Ex. G, 40:5-16). Around that

---

[3] At her deposition, Ms. Kimes stated that she had never been denied FMLA leave after submitting paperwork, and never had her pay docked for FMLA leave while employed by the University. Id. at Ex. J, 389:6-390:3.
[4] Ms. Kimes asserts that, as a result of this incident, she was afraid to use her FMLA leave again in the future. (ECF No. 53, Ex. G, 113:6-18).

same time, Captain Cadugan informed Ms. Kimes that simply because her husband was a police officer did not mean that she should also be a police officer. Id. at 41:22-25. Captain Cadugan elaborated that his wife worked in a safe environment as a secretary, and asked Ms. Kimes if she would "like to work in an office where it's safe[.]" Id. at 42:1-5. He then stated that although he did not have an opening for a secretary, he had an open campus safety officer position. Id. at 42:6-10.

In October 2013, Chief Bergmann told Ms. Kimes that, because she is "a female" he understood how Scranton police officers "intimidated" her. Id. at 43:8-18. Finally, in 2013 she was told by Sergeant Adcock that she was gaining a reputation as a "crazy female activist." Id. at 150:5-11.

William Moran, who was employed by the Department from 2005 through 2010, observed Sergeant Savero exhibit "discriminatory behavior towards female officers" including making derogatory comments, such as "women shouldn't be officers" and "female officers shouldn't do this type of work."[5] Id. at Ex. GG, ¶ 5. Matthew Parker, a former police officer with the University, similarly observed

---

[5] The University argues that the Certifications provided by Mr. Moran, Mr. Parker, Mr. Johnson, and Ms. Becker should be disregarded because they are "awash with inadmissible hearsay" and are not based on personal knowledge. (ECF No. 54, pp. 3-4). To be considered during summary judgment, information contained in affidavits or certifications must be capable of admission at trial. E.g., Williams v. Borough of West Chester, 891 F.2d 458, 466 n. 12 (3d Cir. 1989). First, most of the information contained in the Certifications is based on personal knowledge. See (ECF No. 53, Ex. GG, HH, II, JJ). Second, nearly all of the third party statements contained within the Certifications would likely not be considered hearsay under Rule 801 as either (1) not offered for the truth of the matter asserted or (2) as a party admission. Consequently, the vast majority of the information contained in the Certifications is admissible. To the extent the Certifications contain inadmissible hearsay, the Court did not rely upon that information.

Sergeant Savero treat "Ms. Kimes drastically different than other male officers[.]" Id. at Ex. HH, ¶ 7. Mr. Parker observed Sergeant Savero assign Ms. Kimes menial and unwanted tasks; this included gathering other officers around and laughing while forcing Ms. Kimes to complete tasks in the rain. Id. at ¶¶ 9-10.

Erik Johnson, a police officer with the University since 2006, believed that Ms. Kimes was "definitely treated differently than other male officers in her position[.]" Id. at Ex. II, ¶ 16. Katherine Becker, a police officer with the Department from 2012 until 2014, stated that "gender played a major role" in the way both she and Ms. Kimes were treated. Id. at Ex. JJ, ¶ 26. She opined that it "seems to me that the University obviously and deliberately discriminates against female [o]fficers, requiring experienced female officers to do more training than other male officers and giving females less desirable assignments on campus." Id.

## C. Altered Incident Report

On April 29, 2012, Ms. Kimes drafted an incident report describing a work accident in which Officer Eugene Groysman was injured (the "Incident Report"). Id. at Ex. P. As initially drafted, the Incident Report contained a reference to a phone call that Ms. Kimes placed to Captain Cadugan after the incident; Captain Cadugan did not asnwer the phone call, and did not return the call for approximately twenty minutes. Id. at Ex. Q, 21:14-17. Ms. Kimes included this information in the Incident Report because she believed that she was required to

notify a supervisor when an officer was injured on the job. (ECF No. 53, Ex. G, 226:17-22).

Captain Cadugan reviewed the Incident Report and determined that, in his opinion, any reference to the unreturned phone call was not relevant to the incident, and therefore instructed Investigator Kevin Rude to request that Ms. Kimes remove the reference from the report. Id. at Ex. MM, 39:11-18. Mr. Rude agreed that the reference was not "pertinent" to the report. (ECF No. 46, Ex. Q., 19:20-24; 21:18-22). Ms. Kimes refused to remove the reference, so Captain Cadugan removed it instead. Id. Mr. Rude then brought the altered Incident Report to Ms. Kimes to sign, and placed a post-it note on the Incident Report stating that Ms. Kimes had forgotten to sign it. Id. at 19:20-24, 21:18-22; Ex. S. After Ms. Kimes stated that she recalled signing the report, Mr. Rude became impatient and told her to "hurry up" and sign the report.[6] Id. After signing it, Ms. Kimes reviewed the Incident Report via the dispatch computer, and noticed that it had been altered. Id.

On May 1, 2012, Ms. Kimes reported the incident with Mr. Rude to Sergeant Savero, informing him that she could no longer "take responsibility" for the Incident Report because it had been altered. Id. She reported the alteration out of

---

[6] Mr. Rude disputes this version of events, and states that he gave the unaltered report to Captain Cadugan with an explanation that Ms. Kimes refused to make alterations to the Incident Report. At some point afterward, a signed, altered version of the Incident Report was dropped off in Mr. Rude's mail box. (ECF No. 53, Ex. NN, 21:8-25:11).

concern for the integrity of the Department.  Id.  Sergeant Savero's only response was "okay."  Id.  On July 23, 2012, Ms. Kimes sent an e-mail to Chief Bergmann to report the alteration, as well as her concerns that she was being retaliated against due to her initial report to Sergeant Savero.  Id.  In response to her complaint, Chief Bergmann informed Ms. Kimes' that she should take a demotion, and never investigated her complaint.  (ECF No. 53, Ex. G, 225:18-227:8).

### D. July 2012 Performance Review

On July 17, 2012, a Performance Review was completed for Ms. Kimes (the "July Performance Evaluation").  Id. at Ex. T.  Ms. Kimes was found to have unacceptable performance in decision making and discernment, where she was described as having problems "making [her] own decisions[,]" displaying "poor confidence ability[,]" and needing constant guidance from others.  Id. at US0032.  Ms. Kimes had unacceptable performance in job knowledge, where it was noted that she required supervision and oversight, had difficulty performing general tasks, and had several incidents "where she seemed lost on how to handle [the] situation."  Id. at US0033.

It was also noted that she needed improvement in areas of: time management and punctuality; initiative and innovation; communication; quality of work; accountability; knowledge of university resources; and adaptability.  Id. at

US0033-34.  Ms. Kimes overall rating was "needs improvement" and therefore she did not qualify for a pay raise.  Id. at US0036.

On July 19, 2012, Ms. Kimes submitted an addendum to the July Performance Evaluation, contesting several of the evaluations.  Id. at Ex. U.  Ms. Kimes felt that the July Performance Evaluation "was nitpicking in nature[,] citing minor deficiencies in an attempt to ensure [that she receive a demotion] and not receive the annual pay raise."  Id.  Ms. Kimes provided specific examples of her conduct which she believed contradicted the grades in her evaluation.  Id.  She never submitted the addendum to human resources or followed proper procedures for submitting a complaint.  Id. at Ex. J, 390:4-24.

**E. Post-July Performance Review**

On August 15, 2012, Ms. Kimes received a verbal reprimand for failing to report to the scene of a July 18, 2012 traffic incident; a written corrective notice was provided on August 29, 2012.  Id. at Ex. H, US0064; Ex. V.  On November 18, 2012, Ms. Kimes received a Corrective Action Notice related to her decision making when dealing with intoxicated students.  Id. at Ex. X.  On October 9, 2012, Ms. Kimes was placed on a performance improvement plans to address areas of substandard performance.  Id. at Ex. W.  Chief Bergmann could not recall any other officer being placed on such a performance plan, despite other officers having "categories that they needed improvement."  (ECF No. 53, Ex. LL, 20:13-

16; 23:2-4). Ms. Kimes successfully completed the performance improvement plan on January 8, 2013. (ECF No. 46, Ex. Y).

Despite having seniority, on February 4, 2013, Ms. Kimes was transferred to the night shift and removed from the Workplace Safety Committee in order to give her more training as an officer. (ECF No. 53, Ex. Z, US0069; Ex. G, 138:2-9; Ex. LL, 52:18-22). Finally, on March 18, 2013, Ms. Kimes again received a written corrective notice for her handling of an intoxicated student. (ECF No. 46, Ex. Z). On May 20, 2013, Ms. Kimes failed to qualify during a scheduled firearms training session. Id. at Ex. H, US0070-71.

On May 27, 2013, Ms. Kimes received an annual performance evaluation; her overall performance met expectations, and she was given a pay raise. Id. at Ex. AA, US0051. Ms. Kimes was rated as needing improvement in three categories: decision making and discernment where she had "demonstrated . . . poor decision making with regards to intoxicated persons[;]" professional development where she required improvement in firearms skills; and accountability where she often made "excuses for her mistakes." Id. at US0047-49.

In the subsequent months, continuing through late September 2013, Ms. Kimes was commended by her superiors for her work. On August 25, 2013, Ms. Kimes discovered an assault victim, and was able to apprehend the suspect who was later charged with additional crimes. (ECF No. 53, Ex. Z, US0071). Sergeant

Adcock commended her work, stating "Good work by Officer Kimes!" Id. On September 20, 2013, Chief Bergmann noted the work Ms. Kimes had done at a fundraiser, describing it as a good reflection on the Department, and a clear demonstration of "her dedication to the University and the students who we serve." Id. Finally, on September 28, 2013, Sergeant Adcock wrote:

> I spoke with [Ms. Kimes] about how pleased I have been with her continued growth as a police officer. [Ms. Kimes] has been handling a large volume of the intoxication reports on the weekend. Since the beginning of this semester [Ms. Kimes] had shown a noticeable increase in her work performance, report writing and overall attitude.

Id.

### F. September 14, 2013 Incident Report and Subsequent Termination

On September 14, 2013, Ms. Kimes responded to a report of an assault between two students. (ECF No. 46, at Ex. I, 289:14-18. A student officer was present on the scene and initially reported to Ms. Kimes that he had witnessed a fight between the two students. Id. at 280:14-15. The father of one of the students, a police officer with the Scranton Police Department, pulled Ms. Kimes aside and asked her to leave his son's name out of her report. Id. at 282:4-9.

After speaking with the students involved and the Scranton Police Department, Ms. Kimes informed everyone at the scene that the Scranton police would report the incident as a slip and fall. Id. at 284:10-16. She concluded that the two students were childhood friends who were "goofing around" and one was

12

accidentally injured.  Id. at 282:23-283:9.  At the suggestion of Segeant Adcock, Ms. Kimes drafted an ambulance report ("Police Report").[7]  Id. at 280:20-22.  Ms. Kimes omitted a great deal of the information from the incident because "[y]ou don't put that type of information in an ambulance report."  Id. at 280:23-281:1.

The Scranton Police Department also filed a police report relating to the incident.  Id. at Ex. CC.  According to the report, witnesses described an apparently intoxicated student ("Student A") initiate a fight with another student ("Student B") by throwing a punch.  Id. at US0138.  In an attempt to defend himself, Student B then tried to throw Student A into the grass, but Student A slipped and struck his head on the sidewalk.  Id.

On September 30, 2013, Chief Bergmann received a report from the Office of Student Conduct implying that Ms. Kimes' investigation had been influenced by the Scranton police officer, and that in fact one student had punched another student.  Id. at Ex. DD, 61:3-64:13.  This report led Chief Bergmann to conduct an investigation "into the report and the investigation and potentially Mrs. Kimes' conduct and her performance."  Id. at 68:7-10.  With the assistance of Captain Cadugan, Chief Bergmann completed an investigation and concluded that Ms. Kimes' "report is a misrepresentation of the facts."  Id. at Ex. EE, US0122.  Chief

---

[7] Ms. Kimes testified in a deposition that she told Sergeant Adcock that a student had reported that a punch was thrown, although she did not witness the punch.  (ECF No. 53, Ex. G, 290:8-16).  Chief Bergmann concluded that Ms. Kimes never shared this information with anyone in the Department.  (ECF No. 46, Ex. EE, US0122).

Bergmann determined that Ms. Kimes had violated her duty to conduct a complete and thorough investigation, and had knowingly made false, inaccurate, or misleading statements in connection with her police duties.  Id.

Thereafter, a meeting was held with Chief Bergmann, Patty Tetrol, Clayton Nottelmann, the vice president for student affairs Dr. Vince Carilli, and the University's general counsel Nancy Dolan.  Id. at Ex. FF, 44:11-17.  During this meeting, the decision was made to terminate Ms. Kimes' employment with the University due to her disciplinary history, the incomplete or misleading incident report, and "a lack of confidence and trustworthiness the University had in Mrs. Kimes."  Id. at 47:10-48:20; Ex. DD, 55:18-56:2.  On October 21, 2013, Ms. Kimes was officially terminated from her employment.  Id. at Ex. HH.

On November 22, 2013, Ms. Kimes filed a charge of discrimination with the Equal Employment Opportunity Commission ("EEOC") and the Pennsylvania Human Relations Commission.[8]  Id. at Ex. A.  On December 16, 2013, Ms. Kimes filed suit against the University in the Lackawanna County Court of Common Pleas; on January 21, 2014, the University removed the action to this Court.  (ECF No. 1).  On January 26, 2015, Ms. Kimes filed a Second Amended Complaint with this Court, alleging: (1) a violation of the Family Medical Leave Act ("FMLA"); (2) a violation of Title VII of the Civil Rights Act of 1964 ("Title VII"); (3) a

---

[8] The EEOC later issued a right to sue letter.  (ECF No. 46, ¶ 4).

violation of the Pennsylvania Whistleblower Law ("Whistleblower Law"); and (4) a violation of the Pennsylvania Human Relations Act ("PHRA").  (ECF No. 24).

## II. STANDARD OF REVIEW

Summary judgment is appropriate where "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  A fact is "material" where it "might affect the outcome of the suit under the governing law."  Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986).  A dispute is "genuine" where "the evidence is such that a reasonable jury," giving credence to the evidence favoring the nonmovant and making all inferences in the nonmovant's favor, "could return a verdict for the nonmoving party."  Id.

The burden of establishing the nonexistence of a "genuine issue" rests on the party moving for summary judgment.  In re Bressman, 327 F.3d 229, 237 (3d Cir. 2003) (quoting Celotex Corp. v. Catrett, 477 U.S. 317, 331 (1986) (Brennan, J., dissenting)).  The moving party may satisfy this burden by either (1) submitting affirmative evidence that negates an essential element of the nonmoving party's claim; or (2) demonstrating that the nonmoving party's evidence is insufficient to establish an essential element of the nonmoving party's case.  Id. at 331.

Where the moving party's motion is properly supported, the nonmoving party, to avoid summary judgment in his opponent's favor, must answer by setting

forth "genuine factual issues that properly can be resolved only by a finder of fact because they may reasonably be resolved in favor of either party." Anderson, 477 U.S. at 250. For movants and nonmovants alike, the assertion "that a fact cannot be or is genuinely disputed must" be supported by "materials in the record" that go beyond mere allegations, or by "showing that the materials cited do not establish the absence or presence of a genuine dispute, or that an adverse party cannot produce admissible evidence to support the fact." Fed. R. Civ. P. 56(c)(1); see also Anderson, 477 U.S. at 248–50.

In deciding the merits of a party's motion for summary judgment, the Court's role is not to evaluate the evidence and decide the truth of the matter, but to determine whether there is a genuine issue for trial. Anderson, 477 U.S. at 249. Although the Court may consider any materials in the record, it need only consider those materials cited. Fed. R. Civ. P. 56(c)(3).

## III. DISCUSSION

The University now moves for summary judgment on all of Ms. Kimes claims: (1) interference and retaliation under the FMLA; (2) gender discrimination and a hostile work environment under Title VII; (3) violation of the Whistleblower Law; and (4) violation of the PHRA. These issues will be addressed in turn.

## A. Gender Discrimination Under Title VII and the PHRA[9]

Ms. Kimes alleges that the University discriminated against her based on her gender. (ECF No. 24). The University argues that most of the allegedly discriminatory events are barred from consideration and, in any event, her claims fail on the merits. (ECF No. 45).

Title VII provides that it is "an unlawful employment practice for an employer . . . to discharge any individual, or otherwise to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin." 42 U.S.C. § 2000e–2(a)(1). The United States Supreme Court has "established an allocation of the burden of production and an order for the presentation of proof in Title VII discriminatory-treatment cases." St. Mary's Honor Ctr. v. Hicks, 509 U.S. 502, 506 (1993) (citing McDonnell Douglas Corp. v. Green, 411 U.S. 792 (1973)).

Under this framework, a plaintiff "must first establish, by a preponderance of the evidence, a '*prima facie*' case of racial discrimination." Id. (citing Tex. Dept. of Cmty. Affairs v. Burdine, 450 U.S. 248, 252-53 (1981)). If the plaintiff

---

[9] The Court addresses both counts together since, "in an action under Title VII and the PHRA, the standards under the federal and state statutes are the same." Vernon v. A & L Motors, 381 F.App'x 164, 167 (3d Cir. 2010) (citing Jones v. Sch. Dist. of Phila., 198 F.3d 403, 409 (3d Cir. 1999)).

establishes a *prima facie* case, the burden then shifts to the defendant to produce evidence which, if believed by the trier of fact, demonstrates "that the adverse employment actions were taken 'for a legitimate, nondiscriminatory reason.'" Id. at 506-07 (quoting Burdine, 450 U.S. at 254-55). If the defendant produces such evidence, the plaintiff must then demonstrate that the proffered reason for her termination was merely pretext. Id. at 507-08 (quoting Burdine, 450 U.S. at 256).

### 1. *Acts Occurring Prior to the Statute of Limitations*

First, the University argues that any events occurring prior to January 26, 2013 are barred from consideration under the Title VII claim, and any events occurring prior to May 26, 2013 may not be considered under the PHRA claim. (ECF No. 46, pp. 12-13). Ms. Kimes in turn argues that the acts may be considered under the continuing violation doctrine. (ECF No. 52, pp. 2-4).

Generally, a plaintiff must file a discrimination claim with the EEOC within 300 days of the discriminatory act, or within 180 of the discriminatory act under the PHRA. See Oshiver v. Levin, Fishbein, Sedran & Berman, 38 F.3d 1380, 1385 (3d Cir. 1994). Any acts that occurred prior to those respective dates are barred from consideration. Mikula v. Allegheny Cnty. of Pa., 583 F.3d 181, 183 (3d Cir. 2009). This rule does not apply, however, when the defendant's unlawful conduct has been part of an ongoing practice. Cowell v. Palmer Twp., 263 F.3d 286, 292 (3d Cir. 2001).

Under the continuing violation doctrine, "when a defendant's conduct is part of a continuing practice, an action is timely so long as the last act evidencing the continuing practice falls within the limitations period; in such an instance, the court will grant relief for the earlier related acts that would otherwise be time barred." Id. (quoting Brenner v. Local 514, United Bhd. of Carpenters & Joiners of Am., 927 F.2d 1283, 1295 (3d Cir. 1991)).  The United States Court of Appeals for the Third Circuit has set forth a two part test to determine whether the continuing violation doctrine applies to a given case.  "First, [the plaintiff] must demonstrate that at least one act occurred within the filing period . . . Next, the plaintiff must establish that the [alleged wrong] is more than the occurrence of isolated or sporadic acts."  West v. Phila. Elec. Co., 45 F.3d 744, 755 (3d Cir. 1995).

In resolving the second step, courts should consider: "(1) subject matter – whether the violations constitute the same type of discrimination, tending to connect them in a continuing violation; (2) frequency – whether the acts are recurring or more in the nature of isolated incidents; and (3) degree of permanence[.]"  Cowell, 263 F.3d at 292 (citing West, 45 F.3d at 755, n. 9).  However, the Supreme Court has differentiated between acts of discrimination that fall under the doctrine, which usually occur "over a series of days or perhaps years," and discrete acts falling outside the doctrine, wherein "a single act of harassment" is alone actionable.  Nat'l R.R. Passenger Corp. v. Morgan, 536 U.S.

101, 116 (2002).  The Third Circuit has created a non-exhaustive list of discrete

acts that qualify as discrete: "termination, failure to promote, denial of transfer,

refusal to hire, wrongful suspension, wrongful discipline, denial of training, [and]

wrongful accusation."  O'Connor v. City of Newark, 440 F.3d 125, 127 (3d Cir.

2006) (citing Morgan, 536 U.S. at 114).

Although the continuing violation doctrine applies in numerous situations, it

has particular vitality in the employment discrimination context, where the

plaintiff's claim "is based on the cumulative effect of a thousand cuts, rather than

on any particular action taken by the defendant."  Id. at 128.  "In such cases,

obviously the filing clock cannot begin running with the first act, because at that

point the plaintiff has no claim; nor can a claim expire as to that first act, because

the full course of conduct is the actionable infringement."  Id. (citing Morgan, 536

U.S. at 117-18).

Regarding the first prong of the inquiry, a discriminatory act occurred within

the relevant time period; Ms. Kimes was terminated from her position with the

University on October 21, 2013.  (ECF No. 36, Ex. HH).  She filed her complaint

with the EEOC and PHRA on November 22, 2013, well within the respective 300

and 180 day statutes of limitations.  Id. at Ex. A.

Second, contrary to the University's assertions, many of the acts that are

alleged by Ms. Kimes were not discrete acts, but rather form a continuing

violation.  In the years prior to her termination, Ms. Kimes was subject to numerous discriminatory acts, the most obvious of which were the generally sexist comments directed toward her by her supervisors.  In July 2012, Sergeant Savero stated that "he doesn't feel comfortable with female officers" and did not want Ms. Kimes on his shift.  (ECF No. 52, Ex. G, 40:5-16).  Around the same time, Captain Cadugan explained that his wife worked in a safe environment as a secretary, asked Ms. Kimes if she would "like to work in an office where it's safe[,]" and explained that although he did not have an open secretary position, he could demote her to a campus safety officer position.  Id. at 42:1-10.  In October 2013, Chief Bergmann told Ms. Kimes that, because she is "a female" he understood how Scranton police officers "intimidated" her.  Id. at 43:8-18.

In the summer of 2012 Ms. Kimes was ordered to clean the Department's break room despite the fact that no other officer had ever been ordered to clean the break room.  (ECF No. 52, Ex. G. 35:20-36:9; Ex. OO, 29:1-7).  Numerous other officers also stated under oath that the Department supervisors treated "Ms. Kimes drastically different than other male officers" by, *inter alia*, assigning Ms. Kimes menial and unwanted tasks.  (ECF No. 52, Ex. HH, ¶¶ 7-10; Ex. II, ¶ 16; Ex. JJ, ¶ 26).  These acts continued throughout Ms. Kimes' employment.  Id.

These acts and statements constitute the same type of discrimination.  The statements and actions taken by Ms. Kimes' supervisors were all connected by a

single thread – an apparent belief that women were inherently incapable of performing the duties associated with being a police officer, and assigning tasks that were, in their eyes, more suitable for women. Moreover, these acts were not isolated, but were continuous and ongoing through at least the year and a half prior to Ms. Kimes' termination. As a result, the Court concludes that the continuing violation doctrine does apply in this matter, and most of the alleged acts may be considered under Ms. Kimes' Title VII and PRHA claims. Cowell, 263 F.3d at 292.

However, the Court does agree that some acts are barred from consideration. Ms. Kimes alleges numerous instances of wrongful discipline in her Complaint and Statement of Facts. To the extent that these acts occurred prior to the relevant dates for the EEOC complaint and PHRA complaint, they are barred from consideration. O'Connor, 440 F.3d at 127. Furthermore, Ms. Kimes' July 2012 Performance Evaluation is also barred from consideration under these claims. That act was discrete and alone actionable, and is similar in nature to failure to promote or wrongful discipline, both of which constitute discrete acts. See id.

Having determined that many of the earlier acts alleged by Ms. Kimes are actionable, the Court now turns to its analysis of the underlying claims.

2.    *The Merits of the Underlying Title VII and PHRA Claims*

The University first argues that Ms. Kimes cannot establish a *prima facie* case of gender discrimination. (ECF No. 45, pp.13-14). Alternatively, the University contends that, even if Ms. Kimes could establish a *prima facie* case, the University provided legitimate, nondiscriminatory reasons for her termination, which Ms. Kimes cannot show were pretextual. Id. at 14-15.

a. *Prima Facie Case*

Although the elements of a *prima facie* case "depend on the facts of the particular case," a plaintiff in a Title VII discrimination case must generally demonstrate that: (1) she is a member of a protected class; (2) she was qualified for the position; (3) she suffered from some form of adverse employment action; and (4) those actions were taken under circumstances that give rise to an inference of unlawful discrimination. Jones v. Sch. Dist. of Phila., 198 F.3d 403, 410-11 (3d Cir. 1999). In this analysis, the focus "is always whether the employer is treating 'some people less favorably than others because of their race, color, religion, sex, or national origin.'" Pivirotto v. Innovative Sys., Inc., 191 F.3d 344, 352 (3d Cir. 1999) (quoting Furnco Constr. Corp. v. Waters, 438 U.S. 567, 577 (1978)). Therefore, the plaintiff must produce "sufficient evidence to allow a fact finder to conclude that the employer is treating some people less favorably than others based upon a trait that is protected under Title VII." Iadimarco v. Runyon, 190 F.3d 151, 161 (3d Cir. 1999).

A plaintiff must also "establish some causal nexus between [her] membership in a protected class and the decision" to fire her. Sarullo v. U.S. Postal Serv., 352 F.3d 789, 798 (3d Cir. 2003). In other words, the plaintiff's gender must have been a "determinative factor" in the defendant's decision to terminate her employment. Watson v. Se. Pa. Transp. Auth., 207 F.3d 207, 215 (3d Cir. 2000). This requires that the plaintiff submit "evidence adequate to create an inference that an employment decision was based on an illegal discriminatory criterion." Pivitotto, 191 F.3d at 356 (quoting O'Connor v. Consol. Coin Caterers Corp., 517 U.S. 308, 312 (1996)).

The first three elements are not in dispute here. Ms. Kimes is a member of a protected class, and was qualified for her job as a sworn police officer for the University. (ECF No. 46, Ex. F). The University took adverse action against Ms. Kimes by terminating her employment. The only dispute is whether the circumstances of her termination give rise to an inference of unlawful discrimination.

Viewing the facts in the light most favorable to Ms. Kimes, she has demonstrated that the circumstances of her termination give rise to an inference of discrimination based on gender. Throughout her time with the University, Ms. Kimes was treated differently than her male colleagues, resulting in less favorable assignments and tasks. See (ECF No. 53, Ex. HH, ¶¶ 9, 12; Ex. II, ¶ 16; Ex. G

35:20-36:9).  Ms. Kimes was also subjected to a series of undoubtedly sexist comments during the course of her employment.  (ECF No. 52, Ex. G, 40:5-16; 41:22-42:10; 43:8-18; 150:5-11).  Given these facts, a jury could reasonably conclude that the University treated Ms. Kimes less favorably than her male colleagues based on her gender; therefore, she has established a *prima facie* case of gender discrimination.[10]  Iadimarco, 190 F.3d at 161.

        **b.**    *Nondiscriminatory Reason for Termination and Pretext*

The University next argues that Ms. Kimes was terminated for legitimate, nondiscriminatory reasons.  (ECF No. 45, p. 14).  Specifically, the University argues that Ms. Kimes was terminated as a result of the investigation into the Police Report, as well as her performance record.  Id.  It is undisputed that this does constitute a legitimate, nondiscriminatory reason for Ms. Kimes' termination.  See (ECF No. 52, pp. 11-12).  However, the Court concludes that Ms. Kimes has satisfied her burden of showing that the proffered reasons for her termination were pretextual.

"To demonstrate pretext under the summary judgment standard, a plaintiff must either (1) offer evidence that 'casts sufficient doubt upon each of the

---

[10] While the University accurately points out that Ms. Kimes cannot demonstrate that male officers were not fired under the same or similar circumstances as those that led to her termination, such a showing is not required at this stage.  While such a showing may itself establish a *prima facie* case, such a showing is not required to establish a *prima facie* case.  See Pivirotto, 191 F.3d at 357 ("a plaintiff [can] make out a prima facie case even without demonstrating that employees outside of the relevant class were treated more favorably").

legitimate reasons proffered by the defendant so that a factfinder could reasonably conclude that each reason was a fabrication,' or (2) present evidence sufficient to support an inference that 'discrimination was more likely than not a motivating or determinative cause of the adverse employment action.'" Shahin v. Delaware, 563 F.App'x 196, 199 (3d Cir. 2014) (quoting Fuentes v. Perskie, 32 F.3d 759, 762 (3d Cir. 1994)).  "[F]actors such as the defendant's credibility, the timing of an employee's dismissal, and the employer's treatment of the employee could raise an inference of pretext which would make summary judgment for the employer inappropriate." Josey v. John R. Hollingsworth Corp., 996 F.2d 632, 638-39 (3d Cir. 1993).

Although the Third Circuit does not require affirmative evidence of discrimination, the standard of proving pretext "places a difficult burden on the plaintiff." Fuentes, 32 F.3d at 765.  This standard requires that a plaintiff "put forward 'such weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions in the employer's proffered legitimate reasons for its action that a reasonable factfinder *could* rationally find them unworthy of credence.'" Kautz v. Met-Pro Corp., 412 F.3d 463, 467 (3d Cir. 2005) (quoting Fuentes, 32 F.3d at 765) (emphasis in original).  Thus, the plaintiff must "present evidence contradicting the core facts put forward by the employer as the legitimate reason for its decision."

Id. (citing Stanziale v. Jargowsky, 200 F.3d 101, 106 (3d Cir. 2000); Keller v. Orix Credit Alliance, Inc., 130 F.3d 1101, 1110 (3d Cir. 1997)).

The Third Circuit has noted that "pretext is not shown by evidence that 'the employer's decision was wrong or mistaken, since the factual dispute at issue is whether discriminatory animus motivated the employer, not whether the employer is wise, shrewd, prudent, or competent.'" Id. (quoting Fuentes, 32 F.3d at 765). Therefore, the plaintiff is required to demonstrate "that the employer's articulated reason was not merely wrong, but that it was 'so plainly wrong that it cannot have been the employer's real reason.'" Jones, 198 F.3d at 413 (quoting Keller, 130 F.3d at 1109).

Ms. Kimes has presented sufficient evidence from which a reasonable juror could disbelieve the University's proffered explanations for her termination. The first explanation provided, that the termination was motivated at least partially by Ms. Kimes' disciplinary record, is untenable for two reasons. First, a factfinder could conclude that Ms. Kimes' disciplinary record was tainted by her supervisors' discriminatory behavior towards Ms. Kimes. In that respect, Ms. Kimes has produced evidence indicating that she was disciplined multiple times for issues which other male colleagues were not disciplined for. See (ECF No. 53, Ex. G, 172:2-12; GG, ¶ 7; II, ¶ 7).

Second, despite the University's assertions that Ms. Kimes' performance issues played a role in her termination, the undisputed facts reveal that her performance improved during the months prior to her termination, and her supervisors were generally pleased with her work. On January 8, 2013, Ms. Kimes completed her performance improvement plan, with supervisors noting drastic improvement in her performance. (ECF No. 46, Ex. Y). Ms. Kimes' final performance evaluation, issued in June 2013, rated her as meeting expectations. Id. at Ex. AA.

Moreover, Ms. Kimes' supervisor, Sergeant Adcock, commended her for her excellent work in a burglary case in August 2013, and on September 20, 2013, Chief Bergmann noted that her actions at a fundraiser demonstrated dedication to the University and reflected well on the Department. Id. at Ex. H, US0071. Finally, on September 28, 2013, less than one month prior to Ms. Kimes' termination, Sergeant Adcock noted:

> I spoke with [Ms. Kimes] about how pleased I have been with her continued growth as a police officer. [Ms. Kimes] has been handling a large volume of the intoxication reports on the weekend. Since the beginning of this semester [Ms. Kimes] had shown a noticeable increase in her work performance, report writing and overall attitude.

Id. This indicates an overall satisfaction with Ms. Kimes work and tends to undermine the validity of the University's proffered reason for her termination. Consequently, a reasonable factfinder could find the University's explanation that

Ms. Kimes' performance played a role in her termination is "unworthy of credence." <u>Fuentes</u>, 32 F.3d at 765.

Next, regarding the University's explanation that Ms. Kimes was terminated largely due to her false police report, a genuine issue of material fact regarding the investigation and the propriety of the University's decision precludes summary judgment. Ms. Kimes has stated that, after conducting her investigation into the September 14, 2013 incident, she concluded that no fight had occurred. (ECF No. 46, Ex. J, 282:23-283:9). She also stated that she spoke with her supervisor Sergeant Adcock and notified him of the facts of the case, including the statement by a witness that one student had thrown a punch. <u>Id.</u> at 280:14-281:6. Sergeant Adcock then informed her to report the incident as an ambulance report rather than a police report. <u>Id.</u> During an interview with Chief Bergmann, Sergeant Adcock denied that any of this conversation had occurred.[11] <u>Id.</u> at Ex. EE, US0118.

This difference in testimony raises a genuine issue of material fact as to whether the University's factual conclusions and decision to terminate Ms. Kimes were "so plainly wrong that it cannot have been the employer's real reason."[12]

---

[11] The University argues that it is undisputed Ms. Kimes reported to Sergeant Adcock that there was no fight. (ECF No. 54, p. 10) (citing ECF No. 46, Ex. EE, US0119). The radio conversation which the University references is not in dispute; what is in dispute is whether Ms. Kimes informed Sergeant Adcock of the purported fight when she returned to the station. <u>See</u> (ECF No. 46, Ex. J, 280:19-21).

[12] The University argues that Ms. Kimes' statements alone are insufficient to avoid summary judgment. (ECF No. 54, p. 9). To the contrary, the Third Circuit has unequivocally stated that "We cannot agree that [plaintiff's] uncorroborated deposition testimony is insufficient to create a

Jones, 198 F.3d at 413.  In reaching this conclusion, the Court is guided by the

Third Circuit's decision in Fasold v. Justice, 409 F.3d 178 (3d Cir. 2005), where

that court addressed a substantially similar situation.

In Fasold, the plaintiff was terminated from his position as a detective with

the narcotics unit.  Id. at 182.  Among the reasons provided for the plaintiff's

termination was his early departure from an investigation.  Id.  The Third Circuit

recounted the conflicting testimony regarding the plaintiff's decision to leave the

investigation early:

> As we noted earlier, [plaintiff] Fasold testified that he had advised
> Defendant Bason, his supervisor, that he might need to leave early,
> notified Bason when he was about to leave, and received Bason's
> approval. Specifically, he testified that Bason replied at his first
> notification "ok," and asked no questions. []After the arrest occurred
> and he believed that the matter was under control, he phoned Bason
> again, this time from the scene, and apprised him of the situation and
> told him he was going to leave. Bason did not object. Bason's
> testimony is to the contrary. He denied that he had initially given
> Fasold permission; instead, he testified that he told Fasold during the
> second phone call that he believed Fasold had left the scene too early
> and before the work was completed.

Id. at 187.

---

genuine issue on the question of discriminatory intent. As we have stated in the past, there is no
rule of law that the testimony of a discrimination plaintiff, standing alone, can never make out a
case of discrimination that could withstand a summary judgment motion." Weldon v. Kraft, Inc.,
896 F.2d 793, 800 (3d Cir. 1990) (citing Jackson v. Univ. of Pittsburgh, 826 F.2d 230, 236 (3d
Cir. 1987), cert. denied, 484 U.S. 1020 (1988); Graham v. F.B. Leopold Co., Inc., 779 F.2d 170,
173 (3d Cir. 1985)).

Based on this conflicting testimony, the court concluded that it was improper to grant summary judgment in favor of the defendants.  Id.  The court reasoned that "[i]t is evident that this dispute, whether [plaintiff] had permission to leave the scene, is a material issue of fact.  A jury could conclude from the conflicting testimony that Defendants' reference to [plaintiff's] actions *vis-a-vis* the Cheltenham investigation as the basis for his termination was pretextual."  Id. Similarly, here if a factfinder were to believe Ms. Kimes' testimony that she informed Sergeant Adcock of all the pertinent facts, and that Sergeant Adcock told her to report the incident as an accident, the factfinder could conclude that the University's explanation for Ms. Kimes' termination was pretextual, as she was merely following the direction of a supervisor.

Finally, the history of discriminatory treatment and comments by Ms. Kimes' supervisors would likewise allow a reasonable factfinder to conclude that the proffered reasons for her termination were merely pretextual.  Crediting these instances, a juror could conclude that Ms. Kimes' disciplinary record, performance reviews, and treatment during the investigation into the Police Report were inherently biased.  See, Weldon v. Kraft, Inc., 896 F.2d 793, 799 (3d Cir. 1990) ("If a factfinder were to credit [plaintiff's] testimony regarding the harshness of the treatment he and other blacks received as well as his view of the statistical evidence, it could conclude that the performance evaluations were unfair and that

31

[defendant's] explanations were pretextual").  Therefore, summary judgment on

the Title VII and PHRA discrimination claims is denied.

**B.**     **Hostile Work Environment**[13]

Next, the University moves for summary judgment on Ms. Kimes' hostile

work environment claims on the grounds that: (1) she bases her claims entirely

upon discrete acts;[14] and (2) the isolated comments made by her supervisors are

insufficient as a matter of law to support a claim of a hostile work environment.

(ECF No. 45).

In order to establish a hostile work environment claim under Title VII, a

plaintiff must prove that "(1) [she] suffered intentional discrimination because of

[her] sex, (2) the discrimination was pervasive and regular, (3) the discrimination

detrimentally affected [her], (4) the discrimination would detrimentally affect a

reasonable person of the same sex in that position, and (5) the existence of

*respondeat superior* liability."  Andreoli v. Gates, 482 F.3d 641, 643 (3d Cir.

2007) (quoting Weston v. Pennsylvania, 251 F.3d 420, 426 (3d Cir. 2001))

(internal quotations marks omitted).

---

[13] Although hostile work environment claims may be based on retaliation, Burlington N. & Santa
Fe Ry. Co. v. White, 548 U.S. 53 (2006), Ms. Kimes alleges a hostile work environment based
solely on her gender, and the Court will restrict its analysis accordingly.  See (ECF No. 52, pp. 2-
10).
[14] As discussed previously, most of the acts alleged do not constitute discrete acts.

To prevail, a plaintiff must show that her workplace was "permeated with discriminatory intimidation, ridicule, and insult that [was] sufficiently severe or pervasive to alter the conditions of [her] employment and create an abusive working environment." <u>Morgan</u>, 536 U.S. 101 at 116 (internal quotation marks omitted). A court must consider the totality of the circumstances, including the "frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance." <u>Harris v. Forklift Sys., Inc.</u>, 510 U.S. 17, 23 (1993). "Simple teasing, offhand comments, and isolated incidents (unless extremely serious) will not amount to" a hostile work environment. <u>Faragher v. Boca Raton</u>, 524 U.S. 775, 786-87 (1998) (internal quotations and citations omitted).

Ms. Kimes alleges a hostile work environment based on several instances of harassment, none of which were physical in nature. She alleges that, on three occasions, she was reprimanded for incidents that were not her fault. (ECF No. 52, p. 5). In 2012, she was assigned to clean the break room, something which no other officer was ever assigned to do, was once ordered to lock campus buildings, and was once ordered to take down community advisories.[15] <u>Id.</u>

---

[15] Despite Ms. Kimes' contention that this task was "not assigned to her male colleagues," she admitted in her deposition that at least one other male officer "was given that exact assignment." (ECF No. 53, Ex. G, 55:17-56:8).

Finally, Ms. Kimes references five incidents where derogatory comments were made by supervisors regarding females: (1) at an unknown date, time, and location, Captain Cadugan and Sergeant Savero questioned the physical strength of women and their ability to handle the dangerous aspects of being a police officer; (2) in 2012 Captain Cadugan informed Ms. Kimes that she should be a secretary and work in a safe office as his wife does; (3) in July 2012, Sergeant Savero stated that he wanted Ms. Kimes off of his shift because he was not comfortable with female officers; (4) in 2013 Ms. Kimes was told that she was gaining a reputation as a "crazy female activist"; and (5) in October 2013 Chief Bergmann stated that, because Ms. Kimes was a woman, he understood how Scranton police officers intimidated her.  Id.

Viewing these facts in the light most favorable to Ms. Kimes, she has not established a genuine issue of material fact regarding a hostile work environment.[16] Although she has established intentional discrimination on the basis of her gender, Ms. Kimes has nevertheless failed to demonstrate that the conduct alleged was severe or pervasive enough to create a hostile work environment.

The aforementioned instances were insufficient to alter the conditions of Ms. Kimes' employment, Morgan, 536 U.S. at 116, and were neither severe enough nor

---

[16] Although Ms. Kimes alleges that the discriminatory actions and comments began in 2008, she has been unable to point to a single instance of such conduct prior to 2011, with the exception of a reprimand in 2009 for using the gym facilities while on duty.

pervasive enough to create a hostile work environment.  See, Lulis v. Barnhart, 252 F.Supp.2d 172, 177-78 (E.D. Pa. 2003) (nine incidents of sexual conduct over a period of seventeen months was not pervasive); Saidu–Kamara v. Parkway Corp., 155 F.Supp.2d 436, 439–41 (E.D. Pa. 2001) (four incidents of harassment that occurred over eighteen month period, including unwanted sexual touching of the plaintiff's breasts and buttocks, was not severe or pervasive); Bonora v. UGI Utilities, Inc., No. CIV.A. 99-5539, 2000 WL 1539077, at *4 (E.D. Pa. Oct. 18, 2000) (ten incidents of unwanted touching over two year period did not constitute severe or pervasive behavior); Clayton v. City of Atl. City, 538 F.App'x 124, 126-27 (3d Cir. 2013) (incidents were not severe or pervasive when, over a ten year period, various supervisors asked plaintiff on dates and made sexual passes at her, commented on her physical features, read her love poems, massaged her, altered her work schedule, reprimanded plaintiff multiple times over issues which men were not reprimanded for, grabbed plaintiff's buttocks, and asked other individuals over the radio "which one of those guys is hitting her in the ass tonight?").

Consequently, the Court concludes that, of the many words that may properly describe the behavior of Ms. Kimes' supervisors – inappropriate; lowbred; misogynistic – neither severe nor pervasive are two such words.  The several acts described by Ms. Kimes, occurring over a period of years, amount to isolated instances of non-severe, unpleasant conduct which, when viewed as a

whole, fail to establish a *prima facie* case of a hostile work environment. Consequently, judgment is warranted in favor of the University on this claim.

### C.   **FMLA Claims**

Ms. Kimes raises two claims under the FMLA: (1) that the University interfered with her rights under the FMLA, and (2) the University retaliated against her for exercising her FMLA rights. [17]  (ECF No. 24).  These issues will be addressed in turn.

"Congress enacted the FMLA in 1993 to accommodate 'the important societal interest in assisting families, by establishing a minimum labor standard for leave.'" Sommer v. The Vanguard Grp., 461 F.3d 397, 398-99 (3d Cir. 2006) (quoting Churchill v. Star Enters., 183 F.3d 184, 192 (3d Cir. 1999)).  "To accomplish these goals, the FMLA grants an 'eligible employee' the right to 12 work-weeks of leave over any 12-month period because of, among other things, 'a serious health condition that makes the employee unable to perform the functions' of the employee's position." Id. (quoting 29 U.S.C. § 2612(a)(1)).

### 1.   *FMLA Interference*

Ms. Kimes argues that the University interfered with her FMLA rights in two ways: first, by failing to inform her of her FMLA rights; and second, by questioning her regarding her use of leave.  (ECF No. 52).

---

[17] It is undisputed that Ms. Kimes qualified for FMLA leave.  (ECF No. 45).

The FMLA provides that it "shall be unlawful for any employer to interfere with, restrain, or deny the exercise of or the attempt to exercise, any right provided under this subchapter." 29 U.S.C.A. § 2615(a)(1). The Third Circuit has held that "[t]o assert an interference claim, 'the employee only needs to show that he was entitled to benefits under the FMLA and that he was denied them.'" Sommer, 461 F.3d at 399 (quoting Callison v. City of Philadelphia, 430 F.3d 117, 119 (3d Cir. 2005)). "Under this theory, the employee need not show that he was treated differently than others[, and] the employer cannot justify its actions by establishing a legitimate business purpose for its decision." Id. "An interference action is not about discrimination, it is only about whether the employer provided the employee with the entitlements guaranteed by the FMLA." Id. Regulations provide that "[i]nterfering with the exercise of an employee's rights [includes] . . . not only refusing to authorize FMLA leave, but discouraging an employee from using such leave." 29 C.F.R. § 825.220(b).

a.     *Failure to Provide Information*

Applicable regulations require that employers provide specified information to employees; failure to do to may constitute interference. Conoshenti v. Pub. Serv. Elec. & Gas Co., 364 F.3d 135, 142 (3d Cir. 2004) holding modified by Erdman v. Nationwide Ins. Co., 582 F.3d 500 (3d Cir. 2009). As the Third Circuit summarized:

the DOL's regulations impose upon the employer obligations to communicate with employees regarding their rights under the FMLA. In particular, the regulations require employers to provide employees with individualized notice of their FMLA rights and obligations. Pursuant to 29 C.F.R. § 825.208(a), "[i]n all circumstances, it is the employer's responsibility to designate leave, paid or unpaid, as FMLA-qualifying, and to give notice of the designation to the employee...." . . . Moreover, each time the employee requests leave, the employer must, within a reasonable time thereafter—"one or two business days if feasible," "provide the employee with written notice detailing the specific expectations and obligations of the employee and explaining any consequences of a failure to meet these obligations." 29 C.F.R. § 825.301(b)(1), (c). This specific notice must include, among other things, whether "the leave will be counted against the employee's annual FMLA leave entitlement," 29 C.F.R. § 825.301(b)(1)(i), and "the employee's right to restoration to the same or equivalent job upon return from leave," 29 C.F.R. § 825.301(b)(1)(vii).

Id.

Viewing the facts in the light most favorable to Ms. Kimes, the University failed to properly advise Ms. Kimes of her FMLA rights. In that regard, Ms. Kimes alleges that the University never discussed her FMLA request with her, nor did it ever notify her that the request had been approved. (ECF No. 53, Ex. A, ¶ 4). Ms. Kimes' claim fails, however, based upon the absence of any identifiable injury. See Conoshenti, 364 F.3d at 142 (a plaintiff must demonstrate that the employer's failure to follow the applicable regulations rendered her "unable to exercise that right in a meaningful way, thereby causing injury"). Ms. Kimes has failed to demonstrate, let alone allege, that the University's failure to abide by the

FMLA Regulations interfered with her ability to exercise such rights.

Consequently, summary judgment is granted in the University's favor on this issue.

b.   *Chilling of FMLA Rights*

Next, Ms. Kimes alleges that the actions taken by her supervisors after she took FMLA leave chilled her ability to exercise her FMLA rights in the future. (ECF No. 52, p. 22).  It is undisputed that Ms. Kimes was never denied any requested FMLA leave.  (ECF No. 46, Ex. J, 389:6-390:3).  However, to have an actionable interference claim, it is not necessary that the employer actually deny FMLA leave.  Callison, 430 F.3d at 119.  Rather, a plaintiff may have an actionable FMLA interference claim where the employer takes any action that "could 'chill' desire to take FMLA leave, even when the employee takes the leave."  Grosso v. Fed. Exp. Corp., 467 F. Supp. 2d 449, 463 (E.D. Pa. 2006) (quoting Sherrod v. Phila. Gas Works, 57 F.App'x. 68, 73 n. 6 (3d Cir. 2003)).

Ms. Kimes asserts that the University's actions chilled her desire to take FMLA leave and made her afraid to use her FMLA leave in the future.  (ECF No. 53, Ex. G, 113:6-18).  Specifically, Ms. Kimes alleges that "within weeks" of exercising her FMLA rights in 2012, "she was met with hostility, given a negative performance evaluation and denied a raise."  (ECF No. 52, p. 22).  Furthermore, at a meeting with Captain Cadugan, Ms. Kimes was informed that it was "inconsiderate" to take time off when others would need to cover her shift.  (ECF

No. 46, Ex. U).  The University asserts that Ms. Kimes used FMLA in 2013, and therefore she could not have been discouraged from exercising her rights.

The facts presented by Ms. Kimes raises a genuine issue of material fact as to whether her supervisors' actions chilled her desire to exercise her FMLA. Although Ms. Kimes did use FMLA leave in 2013, the fact that she eventually exercised her FMLA rights has no bearing on whether the University's conduct discouraged her from exercising those rights.[18]  E.g., Sabbrese v. Lowe's Home Centers, Inc., 320 F.Supp.2d 311, 330 (W.D. Pa. 2004) (denying summary judgment where defendant's behavior left plaintiff "without reasonable assurances that he would be permitted to exercise his FMLA rights without interference in the future").

Based on the facts provided by Ms. Kimes, a reasonable jury could conclude that her supervisors' actions, including the statement that taking leave was "inconsiderate," could discourage an individual from using FMLA leave in the future.  See Williams v. Shenango, Inc., 986 F.Supp. 309, 321 (W.D. Pa. 1997) (concluding that, encouraging the plaintiff to reschedule requested FMLA leave "may, in fact, constitute 'interference with' FMLA rights").  Therefore, summary judgment on this claim is denied.

### 2.     *FMLA Retaliation*

---

[18] Ms. Kimes has repeatedly stated that she used FMLA leave in 2011, 2012, and 2013.  See (ECF No. 24, ¶ 19; ECF No. 53, Ex. G, 45:11-13, 48:22-49:6).

Under the FMLA, it is also "unlawful for any employer to discharge or in any other manner discriminate against any individual for opposing any practice made unlawful by this subchapter." 29 U.S.C.A. § 2615(a)(2). "[C]laims based on circumstantial evidence [are] assessed under the burden-shifting framework established in McDonnell Douglas[.]" Id. Accordingly, Ms. Kimes must establish a *prima facie* case, at which point the burden shifts to the University to provide a legitimate, nondiscriminatory reason for the adverse action; if it does so, Ms. Kimes must then produce evidence demonstrating that the proffered reason is merely pretextual. Id.

a.    *Prima Facie Case*

To establish a *prima facie* case, "the plaintiff must prove that (1) she invoked her right to FMLA-qualifying leave, (2) she suffered an adverse employment decision, and (3) the adverse action was causally related to her invocation of rights." Lichtenstein v. Univ. of Pittsburgh Med. Ctr., 691 F.3d 294, 301-02 (3d Cir. 2012) (citing Erdman v. Nationwide Ins. Co., 582 F.3d 500, 509 (3d Cir. 2009)). There is no dispute that Ms. Kimes invoked her right to FMLA-qualifying leave, and that she later suffered an adverse employment decision. The only issue is whether the adverse action was causally related to Ms. Kimes' invocation of her FMLA rights.

"When the 'temporal proximity' between the protected activity and adverse action is 'unduly suggestive,' this 'is sufficient standing alone to create an inference of causality and defeat summary judgment.'" Id. at 306 (quoting LeBoon v. Lancaster Jewish Cmty. Ctr. Ass'n, 503 F.3d 217, 232 (3d Cir. 2007)). "[T]here is no bright line rule as to what constitutes unduly suggestive temporal proximity[.]" Id. "Where the temporal proximity is not 'unusually suggestive,' [the court must examine] whether 'the proffered evidence, looked at as a whole, may suffice to raise the inference.'" Id.

Here, while the University focuses on Ms. Kimes' termination as the adverse action, (ECF No. 54, p. 14), this ignores the prior adverse action; Ms. Kimes' poor performance review and subsequent lost pay raise.[19]  The record reflects that Ms. Kimes requested FMLA leave on July 1, 2012.  (ECF No. 46, Ex. H).  Sixteen days later, the July Performance Evaluation was completed.  Id. at Ex. T.  This evaluation led directly to Ms. Kimes' loss of a pay raise.  Id.

When viewed in the light most favorable to Ms. Kimes, the timing of the adverse action alone is highly suggestive of retaliatory motive.  First, adverse action was taken against Ms. Kimes a merely sixteen days after exercising FMLA leave; this is generally in line with timelines that other courts have found to be

_____

[19] The Court agrees that the timing between Ms. Kimes' decision to exercise her FMLA leave and her eventual termination is too attenuated to support a finding that the timing was unduly suggestive.  Additionally, there is no evidence whatsoever that the decision to terminate Ms. Kimes was based on retaliatory animus in relation to her FMLA leave.

unduly suggestive of retaliatory motive. See <u>Lichtenstein</u>, 691 F.3d at 307

(concluding that a seven day gap between invoking a right to FMLA leave and

plaintiff's termination was unduly suggestive); <u>Seeger v. Cincinnati Bell Tel. Co.</u>,

681 F.3d 274, 283 (6th Cir. 2012) (three week gap was unduly suggestive);

<u>Alexander v. Keystone Mercy Health Plan</u>, No. CIV.A. 06-5599, 2007 WL

1651147, at *5 (E.D. Pa. June 4, 2007) (two week gap established a causal

connection).

The sixteen day gap in this instance becomes even more suggestive when

viewed in context. The adverse action here came in the form of an annual

performance evaluation. By its very nature, such an evaluation must be completed

at a specific time of the year. Therefore, a juror could reasonably infer that the

adverse action may have been taken sooner had the opportunity presented itself,

especially in light of Captain Cadugan's statement to Ms. Kimes, made during the

meeting regarding the Performance Evaluation, that it was "inconsiderate" to take

leave when the Department was understaffed.

Under the relevant summary judgment standard, the Court concludes that

Ms. Kimes has satisfied her burden of establishing a *prima facie* case of retaliation.

Therefore, the burden shifts to the University to provide a legitimate, non-

retaliatory reason for the adverse action. In order to do so, the University must

introduce "evidence which, taken as true, would permit the conclusion that there

was a nondiscriminatory reason for the unfavorable employment decision."
Fuentes, 32 F.3d at 763 (citing Hicks, 509 U.S. at 509). This burden is "minimal."
Lichtenstein, 691 F.3d at 302.

The University has satisfied its burden of providing a legitimate, non-discriminatory reason for the adverse action taken against Ms. Kimes. The University stated that Ms. Kimes' poor performance review was the result of numerous performance issues in the time leading up to the July Performance Review, including at least four oral or written reprimands. See (ECF No. 46, Ex. H). The burden therefore shifts once again to Ms. Kimes to produce evidence of pretext.

To establish pretext, a plaintiff must produce evidence "from which a factfinder could reasonably either (1) disbelieve the employer's articulated legitimate reasons; or (2) believe that an invidious discriminatory reason was more likely than not a motivating or determinative cause of the employer's action." Fuentes, 32 F.3d at 764. "[T]o avoid summary judgment, the plaintiff's evidence rebutting the employer's proffered legitimate reasons must allow a factfinder reasonably to infer that *each* of the employer's proffered non-discriminatory reasons was either a *post hoc* fabrication or otherwise did not actually motivate the employment action." Id. (internal citations omitted, emphasis in original).

Ms. Kimes has produced sufficient evidence of pretext on the University's part. First, at least some of the negative ratings in the Performance Review are unjustified. For example, while Ms. Kimes was rated as needing improvement in time management and punctuality, there was not a single notation of a reprimand, written or oral, for such issues in the year preceding the evaluation. <u>See</u> (ECF No. 46, Ex. H). In fact, in previous years when she was reprimanded multiple times regarding attendance issues, no negative rating was issued in this category.

Furthermore, at the meeting to discuss her July Performance Evaluation, Captain Cadugan directly complained of Ms. Kimes exercising her right to FMLA leave, calling this "inconsiderate." These facts would allow a reasonable juror to conclude that the University's explanation for the adverse action was pretextual, and other motives guided the poor performance review. As a result, summary judgment is denied regarding Ms. Kimes' FMLA retaliation claim.

D. **Pennsylvania Whistleblower Claims**

Lastly, the University moves for summary judgment on Ms. Kimes' Whistleblower Law claims. (ECF No. 45, pp. 18-22). Ms. Kimes alleges that the University retaliated against her after she reported that her supervisors altered a police report. (ECF No. 24). The University argues that it is entitled to summary judgment because (1) Ms. Kimes did not report any wrongdoing, and (2) the

University took action against her for legitimate, non-retaliatory reasons. (ECF No. 45, pp. 18-22).

Section 1423 of the Whistleblower Law provides, in relevant part:

No employer may discharge, threaten or otherwise discriminate or retaliate against an employee regarding the employee's compensation, terms, conditions, location or privileges of employment because the employee or a person acting on behalf of the employee makes a good faith report or is about to report, verbally or in writing, to the employer or appropriate authority an instance of wrongdoing or waste.

43 P.S. § 1423(a). Section 1422 of that law defines the following terms:

"Wrongdoing" is a "violation which is not of a merely technical or minimal nature of a Federal or State statute or regulation, of a political subdivision ordinance or regulation or of a code of conduct or ethics designed to protect the interest of the public or the employer."

A "good faith report" is a "report of conduct defined in this act as wrongdoing or waste which is made without malice or consideration of personal benefit and which the person making the report has reasonable cause to believe is true."

43 P.S. § 1422.

To establish a *prima facie* case under the Whistleblower Law, the plaintiff must prove "by a preponderance of the evidence, that, prior to the alleged acts of retaliation, [s]he had made a good faith report of wrongdoing to appropriate authorities." O'Rourke v. Commonwealth, 566 Pa. 161, 171 (2001) (citing 43 P.S. § 1424(b)). The plaintiff must also "come forward with some evidence of a connection between the report of wrongdoing and the alleged retaliatory acts." Id. (citing Golaschevsky v. Dep't of Envtl. Prot., 554 Pa. 157, 163 (1998)). "If the

employee makes this showing, the burden shifts to the employer to establish that there was a legitimate reason for the adverse action . . . Once the employer offers such evidence, the burden shifts back to the employee to show that this reason was merely pretextual." Anderson v. Bd. of Sch. Directors of Millcreek Twp. Sch. Dist., 574 F.App'x 169, 174 (3d Cir. 2014) (citing Golaschevsky, 554 Pa. at 164-54) (internal citations omitted).

The University moves for summary judgment on the ground that Ms. Kimes has failed to identify any report of actual wrongdoing. (ECF No. 45, pp. 19-21). Specifically, although she reported that Captain Cadugan purportedly "fraudulently" altered a police report, she has failed to connect that action with the violation of any Federal or State statute or regulation, of a political subdivision ordinance or regulation or of a code of conduct or ethics. Id.

Ms. Kimes has argued that she believed Captain Cadugan's alterations of the police report was a violation of the law and constituted fraud. (ECF No. 52, p. 18). However, this has no impact on whether the alterations actually constituted wrongdoing under the Whistleblower Law. The test is objective, not subjective; that is, it does not matter whether the plaintiff holds a belief, even if well-founded, that the conduct constitutes wrongdoing. What is required under the statute is that the plaintiff prove there was an actual "violation" of the laws, regulations, ordinance, or code of conduct or ethics "which is not of a merely technical or

minimal nature[.]" See 43 P.S. § 1422. See also, Bielewicz v. Penn–Trafford Sch. Dist., Civil Action No. 10–1176, 2011 WL 1486017, at *5 (W.D. Pa. Feb. 9, 2011) ("the facts alleged certainly suggest that Defendants' actions were violative of 'a code of conduct or ethics' for school officials and, thus, constitute a 'wrongdoing' under the [Whistleblower] statute").

In reaching this conclusion, it is important to distinguish between a "good faith report" and "wrongdoing." The Whistleblower Act does account for subjective beliefs in determining whether the report was undertaken in good faith. See 43 Pa. § 1422 (defining a good faith report as one "which the person making the report has *reasonable cause to believe* is true") (emphasis added). The reasons for this language is obvious; there will certainly be numerous situations in which an employee has sufficient evidence to suspect that another individual is taking illegal action, but it unable to gather sufficient evidence to prove illegality. In contrast, the definition of wrongdoing plainly omits any subjectivity from the calculus, and couches the definition in purely objective terms. This is logical as well since, with even a cursory investigation, any employee would be able to determine whether the suspected activity violates a law, statute, ordinance, or code of conduct or ethics. Under the objective standard established to define wrongdoing, Ms. Kimes has failed to carry her burden of proving such a violation.

In that vein, she points to two federal statutes that Captain Cadugan purportedly violated when he altered her police report – 18 U.S.C. §§ 4101 and 4104. (ECF No. 24, ¶ 52). However, neither statute could conceivably have any application to the altering of a police report. Both statutes related to Chapter 306 of Title 18 of the United States Criminal Code – this chapter explicitly relates to the "Transfer to or from Foreign Counties" of prisoners or offenders on probation.[20] Ms. Kimes does not reference any other law that Captain Cadugan may have violated.

Ms. Kimes then argues that the alteration constituted insurance fraud as it related to workers' compensation matters. (ECF No. 24, ¶ 53). However, the alterations that Captain Cadugan made to the police report would have no impact on the indubitable conclusion that an employee was injured while at work, nor could the alterations possible be viewed as attempting to effectuate such an impact. Therefore, the alteration would not constitute fraud. E.g., Druz v. Boro of

_____

[20] Arguing that Captain Cadugan's conduct was violative of this portion of the criminal code is such a non sequitur that the Court cannot help but believe that Ms. Kimes' attorney made a typographical error in referencing this section. However, after the University argued that 18 U.S.C. §§ 4101 and 4104 were plainly inapplicable in this instance, Ms. Kimes failed to offer any rebuttal or attempt in any way to cite to another law that may be applicable. See (ECF No. 52, pp. 17-18). Therefore, it would appear that Ms. Kimes' reference to 18 U.S.C. §§ 4101 and 4104 was not mistaken, and that she is unable to reference any applicable law. An independent review of state law leads the Court to conclude that it is conceivable that the alteration of the Department's police report could violate state laws, such as 18 Pa.C.S. § 4911. However, for such law to apply, the police report would need to belong "to, or [be] received or kept by, the government for information or record, or [be] required by law to be kept by others for information of the government." Id. Here, Ms. Kimes has failed to submit any facts demonstrating that the Department's police reports satisfy such conditions.

Manasquan, No. CIV. 05-4088 (SRC), 2006 WL 1098029, at *4 (D.N.J. Apr. 3, 2006) ("'Fraud' is an intentional or deliberate misrepresentation of the truth for the purpose of inducing another, in reliance on it, to part with a thing of value or to surrender a legal right. Fraud, then, is a deceit which, whether perpetrated by words or conduct, or silence, is designed to cause another to act upon it to his or her legal injury") (citing Kevin F. O'Malley, Jay Grenig, and Hon. William C. Lee, 1A Federal Jury Practice and Instructions, § 16.08 (5th ed. 2005)).

Finally, Ms. Kimes asserts in conclusory fashion that Captain Cadugan's behavior in altering her police report is a "violation of . . . [the University's] code of conduct[.]" She again fails to point to any relevant code of conduct that Captain Cadugan may have violated by altering the police report. Rather, revising police reports was a routine practice in the Department. (ECF No. 46, Ex. GG, p. 4).[21]

Ms. Kimes has therefore failed to prove by a preponderance of the evidence that she reported any "violation which is not of a merely technical or minimal nature of a Federal or State statute or regulation, of a political subdivision ordinance or regulation or of a code of conduct or ethics designed to protect the

---

[21] The Court recognizes that Sergeant Savero testified "to my knowledge, based on the code of conduct, if an officer or an investigator or whoever went in and changed another officer's report, then yes, *to me* that would be a violation." (ECF No. 53, Ex. OO, 39:21-40:2) (emphasis added). At best, this statement raises a possibility that a violation of the Department's code of conduct, but this falls short of the preponderance of evidence standard the Ms. Kimes is bound to. O'Rourke, 566 Pa. at 171. Ms. Kimes has inexplicably failed to attach a copy of the code of conduct, and thus, has failed to actually demonstrate that it is more likely than not that the code of conduct was violated or even exists. Therefore, this Court may not rely upon the existence of any purported code of conduct in determining whether wrongdoing occurred.

interest of the public or the employer." 43 P.S. § 1422. Consequently, the University is entitled to summary judgment on this issue.

## IV. CONCLUSION

A review of the record demonstrates that there was no report of wrongdoing as defined under the Whistleblower Law. Furthermore, the conduct of Ms. Kimes' supervisors was not sufficiently severe or hostile to trigger a claim of a hostile work environment. However, there remain genuine issues of material fact regarding Ms. Kimes' claims of gender discrimination under Title VII and the PHRA. Finally, there is a genuine issue of material fact regarding Ms. Kimes' FMLA interference and retaliation claims. For those reasons, the University's Motion for Summary Judgment is granted in part and denied in part.

An appropriate Order follows.

BY THE COURT:

/s Matthew W. Brann
Matthew W. Brann
United States District Judge